IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ROBERT KARL and DENISE KARL,

                                 Plaintiffs,

     v.

UNITED STATES OF AMERICA,

                                 Defendant.

OPINION and ORDER

22-cv-136-jdp

---

This case arises from the purchase of a farm in Muscoda, Wisconsin, by plaintiffs Robert and Denise Karl, appearing here pro se. The Karls agreed in writing to purchase the farm, and successfully sought a loan from the federal Farm Service Agency. The Karls had second thoughts at the closing, where they were represented by counsel. But they went through with it, signed the necessary documents, and the loan funds were disbursed to the seller. According to the Karls, they discovered further problems after the closing, and the seller at first verbally agreed to rescind the sale, but then refused. The Karls are pursuing breach of contract claims against the seller in state court.

In this case, the Karls assert numerous claims against the lender, an agency of the United States. The Karls contend that loan officer Renee Vosberg misled the Karls about the condition of the farm, mishandled the loan process, and pressured them into closing on the property despite their clearly expressed misgivings. I have already dismissed some of the claims, including all those against Vosberg individually. Dkt. 16.

Both sides move for summary judgment on the remaining claims. Dkt. 34 (the government); Dkt. 38 (the Karls). I will grant the government's motion and deny the Karls'. At the heart of the Karls' case is the notion that Vosberg and the Farm Service Agency owed

fiduciary duties to the Karls. But this notion is wrong: the Karls were not vulnerable borrowers and the Farm Service Agency was an ordinary lender, not a fiduciary. Nothing in the summary judgment record suggests that Vosberg hid material information from the Karls or forced them to purchase the property. The Karls wanted to purchase the farm and Vosberg worked diligently to help the Karls realize that goal. The decision to proceed through closing on the farm, despite their misgivings, was the Karls' alone. The government is entitled to summary judgment on the Karls' claims.

UNDISPUTED FACTS

I begin with a minor evidentiary issue. The Karls move to strike some of the government's proposed facts about the Karls' state-court lawsuits related to the farm purchase, contending that the facts are prejudicial and irrelevant to the merits of this case. Dkt. 48. Most of the contested facts are drawn from the Karls' amended complaint in the state-court case. Dkt. 57, ¶¶ 102–10. The Karls' own statements in their pleadings would be admissible as party admissions, and those pleadings are appropriate evidence to support the government's factual contentions. The other contested facts report the court's ruling on a motion to dismiss. *Id*., ¶¶ 111–12. I won't rely on the state court's substantive rulings in deciding the motions in this case. The motion to strike is denied.

The following facts are undisputed except where noted.

**A.  Background**

Plaintiffs Robert and Denise Karl live on a six-acre farm in Waupaca, Wisconsin, where they raise livestock. In 2018, the Karls became interested in buying a 44-acre farm in Muscoda, Wisconsin that was owned by Tatiana Katara. The Karls retained an attorney, Gary Villnow,

to draft an offer to purchase the farm. After some back and forth with Katara, the Karls agreed to purchase the farm as-is for $295,000. The parties' agreement set the closing for April 1, 2019.

The Karls applied for a loan from the Department of Agriculture's Farm Service Agency (FSA) in February 2019. As part of the application, the Karls submitted a cashflow plan that projected their revenues and expenses for the new farm. *See* Dkt. 42-1, at 18. Most of the farm's revenue would come from the sale of organic popcorn and walnuts, with additional income projected for renting the house and land to hunters.

## B.  Preparations for closing

The Karls began working with FSA loan officer Renee Vosberg on the lending process. The FSA approved the Karls' loan application in early March. The notice of loan approval provided that the Karls must sign a promissory note "before loan funds will be released to you." Dkt. 32-3, at 1. Release of funds was also contingent on the Karls receiving an appraisal valuing the farm at $295,000 or more and a test showing that the farm's well water was not contaminated, among other things.

The farm was appraised at $295,000 a few days later. But the appraisal report noted that the farm had only nine acres of tillable cropland, fewer than the 20 acres that the Karls had expected. Vosberg emailed the Karls about the appraisal and told them that she had updated the Karls' cashflow plan to reflect that only nine acres were tillable. Dkt. 32-5. Vosberg stated that "we should still be okay" despite the decreased revenues and that "[i]f you want to proceed, get water tested and septic inspected." *Id.* Vosberg did not give the Karls a copy of the appraisal report. Around this time, the Karls selected Access Title, a real estate company

3

based in Lancaster, to serve as their closing agent. Vosberg electronically transferred the Karls'
loan funds from the FSA to Access Title in preparation for the closing.

On March 27, Vosberg emailed attorney Villnow and Sonia Kirsch, an employee at
Access Title, that the Karls were still waiting on a water test result and asked whether Katara
was willing to postpone the closing. Kirsch told Katara's attorney, George Wilbur, that they
might need to delay closing due to the missing test results. Wilbur replied that Katara still
intended to close as planned on April 1. The next day, Vosberg emailed Kirsch stating, "I know
we are really pushing on this one closing on Monday, I may get the water and insurance
tomorrow" and that "Monday may be pushing it." Dkt. 42-22. The Karls provided Vosberg
with a satisfactory water test the following day, Friday, March 29.

## C.  Closing day

The April 1 closing took place in two locations: the Karls would close in Lancaster at
Access Title's office, and Katara would close at Wilbur's office in LaFarge. That morning,
Wilbur emailed Vosberg, Kirsch, Villnow, and Katara that he would be willing to close without
the Karls present so long as the purchase funds were wired to his trust account by 1:00 p.m.
Wilbur would hold the funds in trust until the Karls had signed the closing documents, at
which point he would release the funds to Katara. The Karls had planned to drive to Muscoda
for a final walkthrough of the farm that day, so they were not expected to arrive at Access Title
until 2:00 p.m. at the earliest. Vosberg called the Karls to see if they could arrive earlier, but
the Karls said that they would arrive between 2:00 and 3:00 p.m. as originally planned. Vosberg
told the Karls to get there as soon as they could. Vosberg told Kirsch that the Karls would be
late. Access Title's bank had a 3:00 p.m. deadline for same-day wire transfers, so Kirsch said
that she would step out at around 2:20 to initiate the transfer to Wilbur's trust account.

The Karls arrived at the Muscoda farm at around 1:00 p.m. The farm was in worse shape than the Karls remembered from their initial walkthrough. There was junk scattered all over the property; several lights in the main farmhouse were not working; and there were cracks in the foundation. The Karls wanted to see whether the toilets and faucets worked, but Katara had left a note telling the Karls not to turn the water on because the pipes were weatherized. After this walkthrough, the Karls decided that they did not want to close on the farm.

The Karls arrived at Access Title at around 2:15 p.m. Vosberg told the Karls that Kirsch was at the bank wiring the loan funds to Wilbur. The parties agree that the Karls were unhappy about the condition of the property because garbage and personal property had been left behind. The parties dispute whether Karls complained about these conditions to Vosberg and how Vosberg responded. Dkt. 59, ¶¶ 73–79. For the purpose of summary judgment I'll accept the Karls' version of the facts: the Karls complained to Vosberg about the garbage and personal property, and Vosberg advised the Karls that they should dispose of that themselves after the purchase.

Kirsch returned from the bank at around 2:30 p.m. Kirsch explained that she had transferred the funds to Wilbur's trust account to ensure that the parties could close that day. The Karls asked Kirsch whether it was possible to reverse the wire transfer, and Kirsch did not respond. Denise asked Kirsch a second time whether the wire could be reversed, and Kirsch again said nothing.

The Karls began reviewing the closing disclosures. Immediately, the Karls and Katara disputed who was on the hook for a $150 snow plowing bill and a $490.93 plumbing fee. Villnow emailed Kirsch and Vosberg stating that the transaction should not be closed until those issues were resolved. After a protracted email exchange between Wilbur, Villnow, and

5

Kirsch, the Karls agreed to pay half of the snow plowing bill. The Karls objected to the plumbing fee because the fee was not listed on their closing disclosure. Kirsch pulled up Katara's closing disclosure and showed the Karls that Katara agreed to pay only the septic fee, not the plumbing fee. At around 4:00 p.m., the Karls decided to pay the plumbing fee and sign the closing documents because they "didn't want the deal to get any worse for us." Dkt. 27-3, at 3 (Denise Karl's written description of events).

Vosberg gave the Karls copies of the farm cashflow plan, the promissory note for the FSA loan, and the mortgage for the Karls' signature. The Karls testified that Vosberg told them that it was the end of her work day and that the Karls needed to hurry up and sign; Vosberg denies that she said either of those things. But it's undisputed that the Karls signed all of the closing documents. Kirsch emailed Wilbur that the Karls had signed the closing paperwork and that he could release the funds to Katara. Wilbur disbursed the funds.

**D. Events after closing**

The Karls went to the farm in Muscoda that evening. When the Karls turned the water on in the house, they saw that water was spraying out of pipes in the basement. Villnow sent an email to Wilbur on the Karls' behalf the next morning, demanding recission of the sale. Katara responded a few hours later that if the Karls wished to rescind the sale, Katara would "refrain from cashing the [Karls'] check" and sell the farm to another party. Dkt. 32-19. Villnow told Katara that the Karls had "accepted [her] offer to rescind" the sale and asked her to return the funds to the Karls. *Id.* Villnow emailed Kirsch, Wilbur, Katara and Vosberg that the parties had agreed to rescind the sale. Around five hours later, Wilbur emailed Villnow that Katara's email was not an offer to rescind and that recission was impossible because funds had already been distributed to pay off Katara's mortgage.

Additional facts will be set out where pertinent to the analysis section.

ANALYSIS

The Karls' remaining claims against the United States arise under two federal statutes: the Federal Tort Claims Act and the Equal Credit Opportunity Act.

Both sides move for summary judgment. Summary judgment is appropriate if the moving party shows that there is no genuine dispute of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). To defeat a summary judgment motion, the nonmoving party must adduce evidence that would allow a reasonable jury to find in the nonmoving party's favor on any material factual dispute. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). The court evaluates each summary judgment motion separately, construing the facts and drawing all reasonable inferences from those facts in favor of the nonmoving party. *Wis. Cent., Ltd. v. Shannon*, 539 F.3d 751, 756 (7th Cir. 2008).

The tort claims are more complex. I'll begin with those, and then turn to the claim under the Equal Credit Opportunity Act.

**A.  Tort claims**

The Federal Tort Claims Act (FTCA) allows plaintiffs to assert state-law tort claims against the United States. 28 U.S.C. § 2674. The FTCA is the exclusive remedy for torts committed by federal employees acting within the scope of their employment. 28 U.S.C. § 2679(b)(1). The FTCA incorporates the substantive law of the state where the tort occurred. *Morisch v. United States*, 653 F.3d 522, 530 (7th Cir. 2011). Both sides apply Wisconsin law to the Karls' tort claims; I will do the same. *See RLI Insurance Company v. Conseco, Inc.*, 543 F.3d

384, 390 (7th Cir. 2008) ("When neither party raises a conflict of law issue in a diversity case, the applicable law is that of the state in which the federal court sits.")

The Karls assert seven tort claims against the government: (1) breach of fiduciary duty; (2) negligence; (3) fraudulent concealment; (4) civil conspiracy to convert; (5) conversion; (6) undue influence; and (7) infliction of emotional distress. But nearly all of the tort claims are based on the same allegedly tortious acts, which can be grouped into two categories. First, the Karls allege that Vosberg wrongfully released the loan funds to Wilbur's trust account before the closing documents were executed. Second, the Karls allege that Vosberg hid key details and documents from the Karls until it was too late for the Karls to back out of the purchase.

### 1. Economic loss doctrine

Much of the relief the Karls seek is barred by Wisconsin's economic loss doctrine. The economic loss doctrine is a judicially-created principle that "preclude[s] contracting parties from pursuing tort recovery for purely economic or commercial losses associated with the contract relationship." *Tietsworth v. Harley-Davidson, Inc*., 2004 WI 32, ¶ 23, 270 Wis. 2d 146, 677 N.W.2d 233. The purpose of the doctrine is to prevent dissatisfied buyers from using tort law to recover losses that were or should have been protected against through contract law. *See Digicorp, Inc. v. Ameritech Corp*., 2003 WI 54, ¶ 35, 262 Wis. 2d 32, 662 N.W.2d 652; *Zimmerman v. Logemann*, No. 09-cv-210-slc, 2009 WL 4407205, at *7 (W.D. Wis. Nov. 30, 2009). The doctrine applies to both consumer and commercial transactions. *Tietsworth*, 2004 WI 32, ¶ 24.

The Karls' alleged damages are the government's lien on their residence and their obligation to repay their FSA loan. Dkt. 4, ¶ 59. Those are economic damages that the Karls

could recover in a breach of contract case. There are exceptions to the doctrine, but the Karls do not argue that any of those apply here. So the economic loss doctrine bars the Karls from seeking relief for those harms in a tort action.

The Karls had asserted contract claims against the government in their amended complaint. *See* Dkt. 4. But I dismissed those claims because the Court of Federal Claims has exclusive jurisdiction over contract claims against the government where the damages exceed $10,000. *See* Dkt. 16, at 4–5. I gave the Karls the opportunity to replead their contract claims in this case if they waived their right to receive more than $10,000 on those claims, but the Karls chose not to do so. *See* Dkt. 22. So the Karls' contract claim fails for lack of jurisdiction, and the Karls cannot use tort claims to recover the economic losses that they could have recovered in a contract suit filed in the proper forum.

The Karls contend that the economic loss doctrine does not preclude them from seeking damages for emotional distress, which is not an economic loss. Neither side cites authority squarely addressing whether the economic loss doctrine applies to emotional injuries arising from a breach of contract. The court found only one pertinent decision, an unpublished one from the Wisconsin Court of Appeals concluding that a plaintiff could not bring a tort claim for emotional distress that "stem[med] from the alleged breach of a contract between the parties." *Conrad v. Batz*, 2014 WI App 63, 354 Wis. 2d 324, 847 N.W.2d 426.

I would be inclined to follow *Conrad* and conclude that the economic loss doctrine bars recovery of emotional distress damages if the distress is caused by a breach of contract. But I need not decide the issue here because the Karls' tort claims fail for other reasons. I will discuss each of the Karls' tort claims in turn.

## 2. Breach of fiduciary duty

A fiduciary duty arises in two ways. Either (1) a person makes a formal commitment to act for the benefit of another; or (2) there are special circumstances that create a legal obligation to act for another's benefit. *Zastrow v. Journal Communs., Inc.*, 2005 WI App 178, ¶ 24, 286 Wis. 2d 416, 703 N.W.2d 673. A typical lending agreement does not constitute a formal commitment that the lender will act for the borrower's benefit. *See Prod. Credit Ass'n of Lancaster v. Croft*, 143 Wis. 2d 746, 754–55, 423 N.W.2d 544, 546–47 (Ct. App. 1988). And there is no evidence here that the Farm Service Agency formally committed to act as a fiduciary.

But the Farm Service Agency takes a somewhat more paternalistic role than a typical commercial lender. And the circumstances of a lending relationship may give rise to a fiduciary duty if the lender "acted as a financial advisor to a subservient borrower." *Id.* at 755 (quoting Steven C. Bahls, *Termination of Credit for the Farm or Ranch: Theories of Lender Liability*, 48 Mont. L. Rev. 213, 233 (1987)). Factors to consider in deciding whether a borrower is subservient include the borrower's age, mental capacity, education, and degree of business experience. *Id.* There is likely to be a fiduciary relationship if a borrower is incompetent, infirm, or "peculiarly dependent" upon the lender to make his or her business decisions. *Id.* at 756 (quoting *Gries v. First Nat. Bank of Milwaukee*, 82 Wis. 2d 774, 779, 264 N.W.2d 254, 257 (1978)). Courts also consider the degree to which the lender controlled the borrower's business affairs. *Id.*

With those factors in mind, the court concludes that no reasonable jury could find that the government had a fiduciary duty to the Karls. The Karls do not suffer from any physical or mental impairments. Robert has a bachelor's degree and Denise has a three-year degree from a technical college. The Karls are both experienced farmers, and they had managed a farm in Waupaca for several years when they decided to purchase the Muscoda farm. Denise

independently negotiated the purchase of the farm from Katara, and the Karls knew to obtain counsel to draft a purchase order. It is reasonable to assume that the Karls are less financially sophisticated than the Farm Service Agency. But the record shows that they are experienced professionals capable of making their own financial decisions who consulted with legal counsel during the lending process. They are undisputedly not subservient borrowers.

It is also undisputed that the Karls remained at all times free to make their own business decisions. *See Prod. Credit Ass'n,* 143 Wis. 2d at 757. A lender's assistance does not create a fiduciary duty if the assistance is "no more than one would expect where the lender has a substantial interest in the borrower's financial welfare." *Id.* at 756. The Karls contend that Vosberg exercised control over their business decisions because she made changes to the Karls' farm operating plan, also called a cashflow plan. Dkt. 52, at 4. Applicants for an FSA loan must submit a plan laying out their projected revenues and expenses. *See* 7 CFR § 761.104. If the agency believes that an applicant's plan is inaccurate, the agency will work with the borrower to resolve those issues prior to final approval of the loan. § 761.104(g). Vosberg made several changes to the Karls' cashflow plan, the most significant being a reduction to the Karls' estimated revenues to reflect that only nine acres of farmland were tillable. But the Karls contend that Vosberg also improperly decreased some capital and equipment expenses and added some revenues related to the sale of animals from their Waupaca farm.

Vosberg's decision to update the cashflow plan did not deprive the Karls of their ability to make their own business decisions. The original plan was developed by the Karls themselves as part of their initial application. But the Karls adduce no evidence that the changes Vosberg made to the plan mandated that the Karls operated according to the revised plan. Updating the plan's revenue estimates did not force the Karls to run their farm in any particular way.

11

Instead, the changes merely gave the parties a more accurate picture of the Karls' financial prospects and the soundness of the loan.

The parties raise minor disputes about other aspects of the FSA assistance to the Karls. Specifically, the parties dispute whether the FSA advised the Karls not to pursue dairy farming and whether Vosberg helped the Karls obtain title insurance. These disputes are immaterial. All those services are the sort of advice and assistance that could be expected given the government's interest in protecting its collateral by ensuring that it was financing a profitable farming operation.

Nothing in the record suggests that the Karls are subservient borrowers or that the government made the Karls' business decisions. The Karls haven't shown that the government acted as their fiduciary. Their breach of fiduciary duty claim fails.

### 3.  Negligence

A negligence claim under Wisconsin law has four elements: (1) a breach of (2) a duty owed (3) that results in (4) harm to the plaintiff. *Paul v. Skemp*, 2001 WI 42, ¶ 17, 242 Wis. 2d 507, 625 N.W.2d 860. To determine the scope of the government's duty to the Karls, I must consider what a reasonable lender in the government's position would be obligated to do under similar circumstances. *See Hoida, Inc. v. M&I Midstate Bank*, 2006 WI 69, ¶ 34, 291 Wis. 2d 283, 717 N.W.2d 17. If a duty exists, I must then determine whether the government breached that duty by failing to exercise ordinary care. *See Hatleberg v. Norwest Bank Wis.*, 2005 WI 109, ¶41, 283 Wis. 2d 234, 256, 700 N.W.2d 15, 26.

The Karls allege that the government was negligent in three main ways: by (1) approving the Karls' loan in light of the condition of the property; (2) allowing the funds to be released

12

before the Karls signed the closing documents; and (3) failing to disclose important information about the farm until it was too late for the Karls to back out.

### a. Approving the Karls' loan

The Karls contend that it was negligent for the FSA to approve the Karls' loan in light of the FSA's knowledge of the "unacceptable condition" of the property and that there were only nine acres of tillable property. *See* Dkt. 52, at 8. This claim fails because the government did not owe the Karls a duty to ensure that the Karls were making a sound business decision by taking out the loan. The government did not owe the Karls a fiduciary duty. And if a lender does not owe a fiduciary duty to a borrower, the lender is not required to stop the borrower from taking out an unwise loan, even if the lender knew, or should have known, that the loan was not in the borrower's best interest. *See Prod. Credit Ass'n*, 143 Wis. 2d at 757–58; *Gries v. First Wis. Nat'l Bank*, 82 Wis. 2d 774, 780, 264 N.W.2d 254, 257 (1978). The government did not owe the Karls a duty to ensure that the farm would profitable. Even if I assume that the farm was not a wise financial investment, the Karls assumed that risk by borrowing the money in the first place, and that risk "cannot be shifted to the [lender]." *See Gries*, 82 Wis. 2d at 780. The government cannot be held liable for the Karls' decision to take out an imprudent loan.

### b. Release of the funds

The Karls contend that it was negligent for Vosberg to release the funds to Wilbur's trust account because it committed the Karls to the transaction without their permission. After the walkthrough, the Karls did not wish to close on the property or sign the FSA promissory note. But by allowing Access Title to wire the loan funds to attorney Wilbur's trust account, so the Karls' argument goes, Vosberg forced the Karls' hand.

This argument fails because transferring the funds from Access Title to Wilbur's account did not obligate the Karls to complete the sale. Wilbur was Katara's agent. But wiring the funds to Wilbur's trust account did not complete the sale. Instead, Wilbur was holding the funds in trust for Katara until closing was completed. If the parties to a real estate sale agree to hold the sale proceeds in trust prior to closing, the proceeds may be disbursed to the seller only after the agreement has been "consummated," which normally requires that the buyer receive the deed or land contract from the seller. *See* Scott C. Minter and Debra Peterson Conrad, *Wisconsin Real Estate Law,* at 9-9 (2014 ed.). The record shows that the funds were disbursed to Katara only after the Karls signed the closing paperwork. *See* Dkt. 29, ¶¶ 13, 21 (Kirsch declaration). The transfer to Wilbur's trust account did not have any effect on the Karls' legal rights or obligations. At that point, the only thing that obligated the Karls to close on the purchase was the Karls' initial purchase agreement with Katara, which required the Karls to close by April 1. If the Karls had refused to close, they may have been in breach of that agreement. But transferring the funds to Wilbur's trust account didn't affect the Karls' ability to walk away.

The Karls don't expressly dispute that they could have refused to close after the money was wired to Wilbur's trust account. But they fault Vosberg for failing to tell the Karls that the wire transfer could be undone. It is undisputed that Vosberg overheard their questions to Kirsch about whether the transfer could be reversed, so the Karls contend that Vosberg should have answered the Karls when Kirsch ignored them.

The first problem with the Karls' argument is a practical one: whether the wire transfer could be "undone" was not really the issue. It's highly likely that the wire transfer, once completed, could be reversed. But Wilbur would have been obligated to return the funds in some way if the parties did not execute the closing documents.

14

The second problem with the Karls' argument is that they cite no authority that Vosberg had an affirmative duty to step in and inform the Karls of their rights. The transfer was initiated by Kirsch, not Vosberg. The mechanics of closing were handled by Kirsch and Access Title, and it was the Karls who selected Access Title as their closing agent. *See* Dkt. 28 (Robert Karl Dep. at 30:2–7). The Karls' questions were not specifically about their FSA loan. A reasonable loan officer in Vosberg's position could conclude that it was unnecessary to answer questions that were directed at Kirsch. Besides, the Karls were consulted with their own attorney, Gary Villnow, throughout the closing.[1] Under those circumstances, Vosberg did not have a duty to step in and inform the Karls of their legal options.

The Karls' final argument on this point is that even if Vosberg was not responsible for the transfer from Access Title to Wilbur's trust account, it was negligent for Vosberg to transfer the funds to Access Title in the first place. The Karls contend that FSA policy required Vosberg to place the funds in a "supervised bank account" because the loan amount exceeded $250,000. The Karls haven't shown that a supervised bank account is required under those circumstances. The provision of the FSA handbook they cite applies to supervised bank accounts that the FSA has already established; it doesn't say anything about creating supervised accounts for new applicants. *See* Dkt. 42-23 at 115–116. To the contrary, FSA policy directs loan officers to transfer loan funds to the closing agent as soon as the FSA receives a preliminary title opinion indicating that the property is unencumbered. *See* Dkt. 32-6, at 2. That's what Vosberg did in this case.

---

[1] The Karls contend that Villnow did not represent them during closing because there was no formal engagement letter. But it is undisputed that Villnow advised the Karls by phone and sent emails on their behalf throughout the closing, so Villnow was acting as their attorney despite the lack of any engagement letter.

But even if Vosberg improperly managed the funds prior to closing, those errors didn't harm the Karls because the money wasn't theirs at that point. The parties' loan agreement provided that the funds would be released to the Karls only after they signed a promissory note. Until that happened, the funds still belonged to the FSA. The alleged harm in this case stems from the Karls' decision to close on the property and sign the promissory note, not from how the government accounted for the loan funds prior to signing. Vosberg's decisions about how to manage FSA funds before they became the Karls' cannot support a negligence claim.

### c. Failure to disclose

As for Vosberg's alleged failure to disclose information about the farm, the Karls focus on the appraisal report prepared for the FSA and the updated cashflow plan. The Karls contend that they would not have purchased the farm or signed the promissory note if they had seen those documents prior to closing.

These claims fail. It is undisputed that both the Equal Credit Opportunity Act and FSA regulations required Vosberg to provide the Karls with a copy of the appraisal report, and that Vosberg did not do so. But the Karls cite no authority that those laws establish a duty of care or that they are "safety statutes" such that violating them is negligence per se under Wisconsin law. *See Grube v. Daun*, 210 Wis. 2d 681, 693–94, 563 N.W.2d 523, 528 (1997).

The fundamental problem for the Karls is that nothing in the record suggests that the Karls were harmed by the omission. The farm was appraised at the price the Karls offered to pay, $295,000. And Vosberg informed the Karls of the most significant finding from the appraisal, which was that only nine acres were tillable. The Karls don't identify anything that the appraiser flagged that would have changed their decision about whether to purchase the farm. Instead, the Karls contend that if they had an opportunity to review the report, they

would have realized that the appraiser missed important defects and thus overvalued the farm. Of course, the Karls could tell that the appraisal overlooked certain defects only if the Karls were already aware of those defects. But the report expressly states that the appraisal was not a home inspection and "could not be relied on" to disclose defects in the property. *See* Dkt. 32-4, at 8. So nothing in the appraisal would inform the Karls that the farm was worth less than the price they had agreed to pay for it. The Karls haven't shown that reviewing the appraisal would have changed their decision to buy the farm, so their negligence claim based on the appraisal report fails.

As for the negligence claim based on a failure to disclose the updated cashflow plan, that claim fails for two reasons. First, the Karls had the opportunity to review the cashflow plan before they signed it at the closing. If the Karls believed that the cashflow plan was infeasible, they could have chosen not to sign it. Second, the Karls were not harmed by any of the changes Vosberg made to the cashflow plan. Even if I assume that the updated plan paints an unrealistically optimistic picture of the Karls' finances, the Karls do not explain how they were harmed by Vosberg's failure to make a more conservative income projection. The Karls do not contend that Vosberg's changes induced them to purchase the farm or that they relied on the changes in deciding to close. The Karls do not contend that the condition of the farm made the cashflow plan unrealistic. The Karls wanted to purchase the farm because *they* thought it was a good investment, not because of the government's revenue projections. The Karls adduce no evidence that the updated plan affected the farm's actual value in any way. The government is entitled to summary judgment on the Karls' negligence claims.

### 4. Fraudulent concealment

Fraudulent concealment is a form of misrepresentation. *See Tietsworth*, 2004 WI 32 at ¶ 12. But nondisclosure does not constitute a misrepresentation unless there is a duty to disclose. *Id.* Whether there is a duty to disclose is a question of law for the court to decide. *Id.* at ¶ 14. A duty to disclose may arise when one party possess unique knowledge of material facts to which the other party does not have access. *See Prod. Credit Ass'n,* 143 Wis. 2d at 759. A fact is material if it "influences whether the transaction is concluded." *Ollerman v. O'Rourke Co.*, 94 Wis. 2d 17, 40, 288 N.W.2d 95, 106 (1980).

The Karls' concealment claims are based on the same alleged omissions as their negligence claims: Vosberg's failure to disclose a copy of the appraisal report and the updated cashflow plan, as well as failing to tell the Karls that they could reverse the wire transfer to Wilbur's trust account. Their concealment claims fail for the same reasons as the negligence claims. The Karls do not identify any information in the report or farm plan that would have led them to reconsider the farm purchase, so they have not shown that those documents were material to the transaction. As for Vosberg's alleged failure to tell the Karls that they could reverse the wire transfer, nothing in the record shows that Vosberg had unique knowledge of that fact. The Karls' questions were not specific to their FSA loan or the FSA's policies and procedures. And the Karls adduce no evidence that the information they sought was truly unavailable to them. If the Karls had questions about the transaction, they could have asked their attorney during their conversations about the other issues with closing.

### 5. Conversion and civil conspiracy to convert

A conversion claim requires (1) intentionally taking property belonging to another; (2) without the owner's consent; and (3) the taking seriously interfered with the owner's right

to possess the property. *See Bruner v. Heritage Cos.*, 225 Wis. 2d 728, 736, 593 N.W.2d 814, 818 (Ct. App. 1999) (citing Wis J-I Civil 2200). To prove a civil conspiracy to convert, the plaintiff must show that there was an agreement between two or more persons to undertake each element of the tort. *See id.* at 737.

The Karls allege that Vosberg converted the Karls' FSA loan funds by transferring them to Access Title and then allowing them to be transferred to Wilbur's trust account. They contend that these transfers "interfered with the right of the Karls to possess the loan funds." Dkt. 52, at 11 (plaintiffs' brief). This claim fails because the Karls did not have the right to possess the loan funds at the time of those transfers. Vosberg's decisions about how to manage the FSA's funds prior to closing did not deprive the Karls of their property. The Karls' conspiracy claim fails for the same reason: Vosberg could not have conspired with Kirsch and Wilbur to deprive the Karls of their right to possess the loan funds because the Karls had no such right. If the Karls mean to argue that their loans were converted because they were released to Katara after they signed the loan documents, that argument fails because the Karls consented to give the funds to Katara when they executed the other closing agreements. There is no evidence that the government wrongfully deprived the Karls of their property or that Vosberg conspired to do so, so the government is entitled to summary judgment on the Karls' conversion claims.

### 6. Undue influence

The Karls contend that Vosberg unduly influenced them to sign the loan documents by ignoring their concerns about the property at closing and by telling the Karls to hurry up and sign the closing documents. The concept of undue influence is most commonly invoked in challenges to a will, but the Wisconsin Supreme Court has applied the concept to the sale of

real estate between living persons. *See First Nat. Bank of Appleton v. Nennig*, 92 Wis. 2d 518, 536, 285 N.W.2d 614 (1979).

A plaintiff can prove an undue influence claim by two methods. First, a plaintiff may show that (1) they are susceptible to influence; (2) the defendant had an opportunity to influence or pressure the plaintiff; (3) the defendant demonstrated a willingness to do something wrong or unfair to obtain a benefit from the plaintiff; and (4) the defendant obtained a benefit for himself or another that he normally would not receive. *See id.* at 536; *In re Estate of Becker*, 76 Wis. 2d 336, 349, 251 N.W.2d 431, 436 (1977).

The Karls cannot prove an undue influence claim under this first method, for two reasons. First, the Karls are not susceptible to influence for the same reasons that they are not subservient borrowers. *See In re Estate of Kamesar*, 81 Wis. 2d 151, 159, 259 N.W.2d 733 (1977) (court must consider "age, personality, physical and mental health and ability to handle business affairs.").

Second, the Karls have not shown that Vosberg was willing to do something wrong or unfair to obtain a benefit from the Karls. Vosberg does not receive a commission or bonus for making loans. The government arguably received a benefit in that the Karls must repay their loan at a four percent annual interest rate. Dkt. 32-15, at 1. But no reasonable jury could conclude that Vosberg demonstrated a willingness to act wrongfully to secure that benefit. Vosberg did not pressure the Karls to close. The Karls approached the FSA because *they* wished to buy the Muscoda farm. Over the next month, Vosberg made a considerable effort to help the Karls realize that goal. Vosberg moved quickly, but she did so only because the Karls had agreed to close by April 1. Vosberg warned the Karls that it would be difficult to close by that date when they first applied for their loan. *See* Dkt. 32-3, at 1 ("[W]e may not have enough

20

time to get it done by the April 1 date"). And when the appraisal report revealed that only nine acres were tillable, she asked the Karls if they wanted to move forward with the purchase.

For the purpose of summary judgment, I will accept as true that Vosberg told the Karls to hurry up and that she was dismissive of the Karls' complaints about the property during closing. But some impatience was understandable; the Karls had spent two hours disputing $650 in fees. Vosberg's expression of impatience, without more, does not show that she was willing to behave wrongfully to secure a benefit from the Karls.

The second way to show undue influence requires a plaintiff to prove that there was a confidential relationship between the plaintiff and the defendant and that the circumstances surrounding the transaction were suspicious. *See In re Faulks' Will*, 246 Wis. 319, 360, 17 N.W.2d 423, 440 (1945). Examples of confidential relationships include "attorney and client, physician and patient, priest and parishioner, confidential advisor and his advisee." *Id.* Vosberg did not have that sort of relationship with the Karls. Vosberg helped the Karls prepare for closing and she offered them financial advice. But there is no evidence that Vosberg worked as the Karls' agent or that she had a duty to keep the Karls' information a secret.

As for suspicious circumstances, the Karls point to Denise's signature on the promissory note. Denise began signing her name as "Denise Elizabeth Dunn," but she crossed out "Dunn" and wrote Karl. Dkt. 32-15. The signature is suspicious, the Karls contend, because Denise's maiden name is "Dunne," with an e at the end. But the Karls do not explain why that is suspicious. They do not contend that Denise's signature was forged, and it is undisputed that Denise signed the promissory note. Reading their brief charitably, I take the Karls to argue that Denise mistakenly wrote and misspelled her maiden name because she was under pressure to close. That falls far short of what is required to demonstrate undue influence. In determining

whether circumstances are suspicious, the question is whether the evidence shows that "the free agency of the [grantor] has been destroyed." *Kamesar*, 81 Wis. 2d at 166. Denise's errors suggest that she was stressed, but they do not show that she was incapable of making her own choices. The Karls were experienced businesspeople in good health. *Cf. id.* at 167 (suspicious circumstances where testatrix was bedridden and did not speak English). The evidence does not show that Vosberg's influence overwhelmed the Karls' agency.

### 7.  Infliction of emotional distress.

The Karls assert a claim for "reckless[] and/or intentional emotional distress." Dkt. 4, ¶ 113. Wisconsin does not recognize a claim for reckless infliction of emotional distress. If the Karls mean to bring a claim for negligent infliction of emotional distress, that claim fails for the same reason the Karls' negligence claims fail. Vosberg did not breach her duty of care to the Karls, so the Karls cannot show that Vosberg negligently inflicted emotional distress. *See Bowen v. Lumbermens Mut. Cas. Co.*, 183 Wis. 2d 627, 632, 517 N.W.2d 432 (1994) (plaintiff must show that "defendant's conduct fell below the applicable standard of care").

As for intentional infliction of emotional distress, a plaintiff must show that (1) the defendant intended to cause emotional distress by his or her conduct; (2) the conduct was extreme and outrageous; (3) that the conduct caused the plaintiff's emotional distress; and (4) that the plaintiff had an extreme disabling response. *Terry v. J. Broad. Corp.*, 2013 WI App 130, ¶ 42, 351 Wis. 2d 479, 515, 840 N.W.2d 255, 271–72. No reasonable jury could conclude that Vosberg intended to cause the Karls emotional harm by helping them purchase the Muscoda farm. Her conduct was not extreme or outrageous. She guided the Karls through the lending process, gave them advice, and worked with them to make sure that they closed by the deadline that the Karls themselves had agreed to. The alleged missteps that the Karls

22

identify, such as failing to disclose the appraisal report and releasing the funds to Access Title, were not even negligent, much less outrageous. The government is entitled to summary judgment on this claim.

## B.  Equal Credit Opportunity Act claim

The Karls also bring a claim against the government under the Equal Credit Opportunity Act. The ECOA makes it unlawful for creditors to discriminate against a credit applicant on the basis of race, religion, or marital status, among other protected characteristics. 15 U.S.C. § 1691(a). The ECOA requires lenders to make certain disclosures to borrowers. Relevant here, lenders must provide a loan applicant with a copy of all written appraisals developed in connection with the application three days before the loan closes. 15 U.S.C. § 1691(e)(1). The Karls contend that Vosberg violated the act by failing to give the Karls a copy of the appraisal report prepared as part of the Karls' FSA loan application.

The government concedes that Vosberg violated the act. But they contend that the Karls do not have standing to bring this claim because they have not suffered an injury in fact. Standing doctrine requires plaintiffs to show that they suffered an injury in fact that is both fairly traceable to the challenged conduct of the defendant and likely to be redressed by a favorable judicial decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). An injury in fact is "an invasion of a legally protected interest" that is "concrete and particularized." *Id.* at 560 (internal quotation marks omitted). A bare procedural violation of a consumer protection statute like the ECOA is not necessarily a concrete injury, even if it gives rise to a statutory cause of action. *Spokeo, Inc. v. Robbins*, 578 U.S. 330, 341 (2016).  The government contends that the Karls have not suffered a concrete harm because there is no evidence that the Karls' failure to review the report within three days of the closing caused

them any tangible injury. The Karls counter that they suffered damages because they would not have purchased the farm if they had the opportunity to review the appraisal. But they also contend that they suffered an "informational injury" because they were entitled to see the report's contents.

As I explained in the section of the opinion discussing the Karls' negligence claim based on the appraisal report, the Karls have not shown that they suffered any tangible injury from Vosberg's failure to provide the Karls with a copy. They do not identify any information in the report that would have prevented them from closing on the loan. The appraisal valued the property at the amount they agreed to pay for the farm, and the report did not identify any defects or red flags with the property. The Karls repeat their argument that a review of the report would have allowed them to see that the appraisal was incomplete. But the report itself did not contain any information that demonstrated that the property was not, in fact, worth $295,000. The Karls reached that conclusion on their own after they conducted a more thorough walkthrough of the property.

As for the Karls' alleged informational injury, an intangible harm can be a concrete injury under certain circumstances. *Spokeo*, 578 U.S. at 341. A violation of a consumer protection statute may be a concrete harm if two conditions are met. First, the alleged harm must bear a close relationship to a harm traditionally recognized as providing a cause of action. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021). Second, the injury must have "harmed or presented an appreciable risk of harm to the underlying concrete interest that Congress sought to protect" by enacting the statute. *Wadsworth v. Kross, Lieberman & Stone, Inc.*, 12 F.4th 665, 668 (7th Cir. 2021).

Neither party discusses whether the Karls' alleged harm bears a close relationship to a harm that traditionally provides a cause of action. The Karls appear pro se and the government did not discuss this element of the test, so it is understandable that the Karls did not address it. Nevertheless, the Karls have the burden to show that they have standing for their claim, *see Laurens v. Volvo Cars of N. Am., LLC*, 868 F.3d 622, 625 (7th Cir. 2017). They failed to meet that burden because they have not shown that their alleged injury bears a close relationship to a common-law tort, such as the tort of misrepresentation.

But even if the Karls had met their burden on the first prong of the standing test, their claim fails on the second prong. The Karls have not shown that Vosberg's failure to provide the Karls with the appraisal harmed a concrete interest that Congress sought to protect with the ECOA. The principal purpose of the ECOA is to eliminate discrimination in the extension of credit. 142 Am. Jur. Proof of Facts 3d 259 (Originally published in 2014). More specifically, the statute is designed "to make certain that no applicant will be *denied* credit because of factors that are unrelated to whether or not the applicant is financially sound enough to justify the extension of credit." *Id.* (emphasis added). The Karls' alleged injury does not harm the interest in non-discrimination that the statute is meant to protect, for two reasons.

First, the Karls do not allege that the failure to provide the appraisal was related to actual or attempted discrimination against them. Allowing a borrower to see and challenge the lender's appraisal prevents lenders from using a faulty appraisal as pretext for denying credit on the basis of discrimination. In this case, requiring disclosure would not serve that purpose because nothing in the record suggests that the Karls were discriminated against. Indeed, some district courts have concluded that discrimination is a necessary element of an ECOA claim based on a failure to disclose an appraisal. *See Arriaga v. Wells Fargo Bank, N.A.*, 2011 WL

4738522, at *8 n.1 (N.D. Ill. Sep. 30, 2011) ("Plaintiffs make no allegation that Draper's failure to furnish them with the appraisal report was the result of discrimination"); *Wiltshire v. Dhanraj*, 421 F. Supp. 2d 544, 557 (E.D.N.Y. 2005).

Second, even if the act more broadly protects against the denial of credit for any improper reason, the FSA *did* extend credit to the Karls. Failing to give the Karls their appraisal did not harm the ECOA's interest in ensuring that all borrowers can access credit. I find no authority that the disclosure requirement was intended to give borrowers more information about whether they should accept an offer of credit. Vosberg's omission did not harm a concrete interest that Congress sought to protect under the ECOA, so they do not have standing to bring an ECOA claim. I must dismiss this claim for lack of jurisdiction.

## CONCLUSION

The Karls' frustration is understandable. The farm they purchased is not the farm that they thought they were buying. And despite the seller's initial willingness to rescind the transaction, the Karls are now stuck repaying a loan that they wish they had not taken out. But the Karls have not shown that their situation was caused by any wrongdoing on behalf of the government. It was the Karls' decision to purchase the farm. It was their responsibility, not the lender's, to ensure that the purchase was sound. Neither Vosberg nor the Farm Service Agency breached any duty of care to the Karls by helping them with their purchase. The government is entitled to summary judgment on all of the Karls' claims.

ORDER

IT IS ORDERED that:

1.  Defendant's motion for summary judgment, Dkt. 34, is GRANTED.

2.  Plaintiffs' motion for summary judgment, Dkt. 38, is DENIED.

3.  The clerk of court is directed to enter judgment for defendant and close this case.

Entered July 25, 2023.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge